UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                  Plaintiff,                     Criminal No.: 19-20492

v.

                                          HON. MARK A. GOLDSMITH

D-1 DARELL DAVIE REED,
        a/k/a "Rell,"

                  Defendant.
_____/

## **GOVERNMENT'S SENTENCING MEMORANDUM**

While on bond to this Court for another case, Defendant Darell Reed led a sophisticated and relentless conspiracy aimed at stealing diamonds from jewelry stores across the country.  Rather than risk harm to himself or risk being caught, Reed recruited and trained numerous coconspirators to travel throughout the United States to terrorize store employees and customers alike to enrich himself.  He instructed his coconspirators to use sledgehammers to smash the glass display cases, and to bring the fruits of their theft back to him.

In the face of these facts, Reed pleaded guilty to Count One of the Third Superseding Indictment, Conspiracy to Commit Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a) and he admitted to the applicability of the sentencing

enhancement for committing this offense while on pretrial release for case No. 17-20837, in violation of 18 U.S.C. § 3147.

The Probation department scored Reed's sentencing guideline range as 188-235 months with a total offense level of 34, and a criminal history category of III (*see* PSR ¶ 135). The parties agreed in the Rule 11 Plea Agreement that Reed's total sentence in this case, and any sentence imposed by the Court in 17-cr-20837 shall not exceed 262 months.   (*See* Plea Agreement: ECF No. 432, PageID.3372).

## I.    <u>Statement of Facts</u>

Reed was released on bond in his 2017 Drug Conspiracy case in December 2017.

Since August 2018, the Federal Bureau of Investigation (FBI) has been investigating a string of similar "smash and grab" style robberies at jewelry stores. During these robberies, the robbers used sledgehammers to break glass enclosures and/or intimidate the stores' employees to unlock the display cases, and then would take diamonds and other jewelry. Over 30 such instances—all fitting similar description and *modus operandi*—have occurred since August of 2018 in the Eastern and Western Districts of Michigan, as well as Indiana, Ohio, Illinois, Pennsylvania, and as far away as Alabama, Florida, Louisiana, Minnesota, New Jersey, and South Carolina. The investigation showed that many of the robberies were connected, planned, and coordinated by individuals in Detroit—primarily by Reed.

Reed admitted to recruiting others to participate in the Hobbs Act robbery conspiracy; to instructing the members of the conspiracy to use sledgehammers during the robberies; and to bring the stolen diamonds and loose jewelry back to Michigan.  He also admitted to directly participating in or planning at least seven robberies of Jared's jewelry stores: Erie, Pennsylvania; Chattanooga, Tennessee; Overland Park Kansas; Baton Rouge, Louisiana; Pinewood, North Carolina; Toledo, Ohio; and Jacksonville, Florida.

Even though Reed only admitted to his involvement in seven robberies, he was involved in significantly more.   Below is a list of all the robberies that Reed was involved. The seven robberies which he acknowledged his involvement are identified with an asterisk.

11/19/18 – Erie, PA*

01/03/19 – Greenwood, IN

02/06/19 – Chattanooga, TN*

02/16/19 – Hoover, AL

03/11/19 – Overland Park, KS*

03/25/19 - Langhorne, PA

04/06/19 – Burnsville, MN

04/10/19 – Columbia, SC

04/10/19 – Little Rock, AK

04/16/19 – Fairfax, VA (attempt)/Auto accident

04/23/19 - Little Falls, NJ (Attempt)

05/08/19 – Baton Rouge, LA*

05/10/19 – Greenwood, IN (Attempt)

05/22/19 – Pineville, NC (Attempt)*

05/23/19 – Toledo, OH*

06/11/19 – Jacksonville, FL*

06/18/19 – Collierville, TN

As the list above graphically illustrates, Reed only acknowledged his involvement in seven (7) of the seventeen (17) robberies and attempted robberies committed by his crews.

Based upon investigation, documents, phone detail records, social media, witnesses, cooperating witnesses etc., clearly Reed was involved in more than twice as many other robberies than the seven he swore he was involved in during his guilty plea. Some examples follow-

PENNSYLVANIA/VIRGINIA

In mid-April 2019, there was a failed robbery in Virginia, directed by Reed, after Reed travelled down to help his crew after Kia Rivers crashed the "clean" car in Pennsylvania.  A review of Devon "Quil" Newby social media reveals a lot of the information that verifies Reed's involvement in this failed robbery.

4

After getting direction from Reed, Newby, Rivers, and associates headed out to do another robbery.  On the way, Newby made a video Instagram post with "My boys wit me" superimposed on a selfie video of Newby, wearing a black sweatshirt with a logo "team no man left behind!" (See Exhibits Video 1A – Posted Video and 1B & 1C - Filed as attachments to ECF No. 426, filed under seal), that he had created earlier.   Newby was driving a car in the dark with three passengers.  Approximately an hour later Newby posted another video of one of his associates at an Ohio toll road service plaza superimposed over the image of the person in the video was "Got June wit me 🙍." (See Exhibits Video 2A – Posted Video and 2B – Filed as attachments to ECF No. 426, filed under seal). However, near the Pennsylvania and Maryland state line, Kai Rivers got into an automobile accident – temporarily derailing their robbery plans. Rivers was driving the "clean" car (a rented 2017 Nissan Altima) when he fell asleep and ran into a highway guard rail. (ECF No. 415, PageID.3091-2 – Super 8 folio & PA Police report). Newby recounted this incident when speaking to Jacksonville (Florida) detectives.  He claimed that in a failed robbery attempt in Virginia his "homeboy" (Rivers) fell asleep, and they had to stay at a "Super 8" or "Motel 6" near "Hancock, Pennsylvania." (Recordings: ECF No. 201).

Immediately after the accident, Newby engaged in a series of calls trying to talk to Darell Reed.  Newby's crew, driving in the "dirty" car were sent to a nearby

hotel to wait further instructions. After finding little success getting ahold of Reed, Newby then called his girlfriend. Newby and his girlfriend each engaged in a series of calls trying to get ahold of Darell Reed. After getting a call from Newby's girlfriend, Darell Reed called Kai Rivers. Rivers however was dealing with the Pennsylvania State Police regarding the accident.  Thereafter, Reed got another call from Newby's girlfriend.  Shortly after that, a preliminary historical cell-site data analysis of Reed's phone showed that Reed travelled from Detroit to the Maryland area to provide the crew a ride back to Michigan in a "clean" car:



However, the crew did not immediately return to Detroit. Instead, Reed directed the crew to travel down to Virginia to do a robbery that ultimately failed. A preliminary historical cell-site data analysis of Reed's phone showed that Reed

travelled from the area of the car crash to Virginia just outside the metropolitan D.C area:



After the failed robbery attempt, Newby began sending Instagram text messages to his associates in Detroit regarding the car crash and the fact they had been in Maryland near Pennsylvania.  He also began posting videos.  One video he posted was of Kai Rivers lying in bed that was taken inside the hotel room of the Super 8 motel in Hancock, Maryland. Newby was making fun of the fact that Rivers crashed his car ("whip"). (See Exhibits Video 3A – Posted Video and 3B - Filed as attachments to ECF No. 426, filed under seal). Another video involved his crew including "June." This is the same "June" individual appeared in a video posted created in Ohio. The video also showed "June," Kai Rivers (lying in bed) and the rest of Newby's crew – two other individuals. (See Exhibits Video 4A – Posted Video and 4B - Filed as attachments to ECF No. 426, filed under seal).

Reed even admitted that he traveled to Pennsylvania.  He told a cooperating coconspirator (C1) that he had to travel to Pennsylvania to pick up Kai Rivers, after Rivers fell asleep while driving and crashed his car. (Exhibit 1, filed under seal, pg. 7).  Reed told C1 that he was not happy about having to pick up Rivers. (*Id*.).   While he did not mention traveling to Virginia, Reed's cell phone records support the statement he made to C1, and his subsequent travel to Virginia.

Reed was also involved with the robberies that took place in Minnesota and South Carolina.

## MINNESOTA

As the Court will recall, after a robbery that took place around April 6, 2019, in Minnesota, it was believed that some of the crew members involved in the robbery stole some of the jewelry from the other coconspirators because they did not show up as planned and did not hand over a lot of stolen jewelry.

After the crew left the robbery site, a few of the crew members failed to meet up with Newby to hand over the stolen jewelry.  Rather, Newby had to go find them. He reached out to an associate in Michigan to complain. He communicated, via text messages ("chats"), with this associate via Instagram.

Newby returned to Michigan with the stolen merchandise, forsaking some of the "thieving" conspirators. However, at the direction of Darell Reed, a few days

later, Newby traveled back toward Minnesota, collected his deserted conspirators and returned to Michigan with them.

## SOUTH CAROLINA

After Newby's difficulties with the Minnesota robbery, around April 10, 2019, Newby was again teamed up with Rivers for the next robbery in Columbia, South Carolina. As before, Newby and Rivers waited outside while their two conspirators, wearing masks and armed with sledgehammers, entered the jewelry store.  Once inside, the robbers threatened the employees and customers with the hammers and ordered them to get on the floor.  One of the store employees described the hammer as a "big cement mallet," that a robber waived at her and told her to get on her knees. She watched as they used the "mallets" to smash the glass of the display cases. (ECF No. 415, PageID.3089). The two robbers escaped in their "dirty" car - a stolen white Dodge Nitro. The coconspirators later met up with Kai Rivers and Devon Newby at a rest area in Kinards, South Carolina. At the rest stop the robbers abandoned their "dirty" car, handed over the stolen jewelry, and got in the car with Newby and Rivers.   All four of the crew then drove back to Detroit, where the jewelry was handed over. The White Dodge Nitro was later recovered. The police discovered items from the robbery – hammer, empty jewelry packaging, jewelry display mounts, two pairs of gloves, black face mask etc.

Later, after returning to Detroit, Darell Reed accused one of the robbers, coconspirator 2 (C2) of not handing over all the stolen jewelry taken from South Carolina. (C2 had also been involved in a robbery in Minnesota.) Due to the relatively small amount stolen during the South Carolina robbery, and only $130,000 taken from the Minnesota robbery, Reed concluded one of the robbers had "again" not handed over all the stolen jewelry. Reed had C2 tortured. A hammer was then used to break C2's arm. Reed then made plans to take him to be killed. He was stuffed into a car trunk. Before his intended killers returned to the car, C2 was able to escape.

In his statement to the FBI, C2 details the involvement that Reed had in the robbery in South Carolina. (*See* Exhibit #3, filed under seal). C2 states that Reed agreed to pay him $6,000 for completing the robbery. (*Id.,* pg.1). C2 details how Reed provided the location, the directions for travel, the types of diamonds to look for, and even how much time to spend in the jewelry store. (*Id.*).

C2 goes on to describe what happened to him when he returned from the robbery in South Carolina. After being accused of stealing some of the diamonds from the jewelry store, C2 is driven to a house on Ohio street in the city of Detroit. There he is confronted by Reed. C2 is forced to strip and is searched. Reed then used a sledgehammer to break C2's left arm. (*Id*. pg. 3). C2 is then forced at

gunpoint into the trunk of a car.  Luckily, C2 was able to escape from the car and get help. (*Id.*).

The statements made by C2 to the FBI are corroborated by C1.  C1 was told by Newby what Reed did to C2. (Exhibit 1, filed under seal, pg. 2-3).  Newby stated that Reed had accused C2 of stealing diamonds, beat him up, and broke his arm. Reed then put C2 in the trunk of a car, but he escaped.  C2 confirmed these events when C1 saw him in jail after being arrested for this conspiracy. (*Id.*).

Based upon the forgoing, Reed undoubtedly was involved in significantly more robberies than the seven he acknowledged during his guilty plea. These include, for example the attempted robbery of a Jared's in Greenwood, Indiana that C1 mentioned as the second Greenwood, Indiana robbery to the FBI and is detailed in his statement. (Exhibit 1, filed under seal, pg. 6).  As Reed's sentencing guidelines only use seven of his seventeen robberies in the calculations, his guidelines are only calculated to hold him responsible for less than half of his criminal conduct.

Despite never having had a job, (PSR ¶ 135), Reed had ample access to cash, and flaunted it regularly on social media:

 

Reed seems unconcerned about his pending drug conspiracy case. He even appears to brag that while he is on bond for his pending case, he's still able to make money while not working:



## II.    **Procedural History**

On December 1, 2017, Reed was charged in a criminal complaint on case number 17-20837 with Conspiracy to Possess with the Intent to Distribute Controlled Substance and to Distribute Controlled Substance in violation of 21 U.S.C. §§ 841(a)(1) and 846.  He was released on bond a few days later.

On July 9, 2019, Reed was named in a criminal complaint charging him and nine others, with conspiracy to commit Hobbs Act robbery. On July 21, 2021, Reed was charged in a Third Superseding Indictment with conspiracy to commit Hobbs Act Robbery. (Third Superseding Indictment: ECF No. 251).

On September 1, 2022, Reed appeared before the Court and pleaded guilty to Count 1 as charged in the Third Superseding Indictment, with the benefit of a Rule 11 plea agreement. (Plea Agreement: ECF No. 432).

## III.    **Sentencing Guideline Calculations and Other 3553(A) Factors**

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a "sentence sufficient, but not greater than necessary." Those objectives are:

(1)  The nature and circumstances of the offense, and the history and characteristics of the defendant;

(2)  The need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation);

(3)  The kinds of sentences legally available;

(4)  The Sentencing Guidelines;

(5)  Sentencing Commission policy statements;

(6)  The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) The need for restitution.

The most relevant factors are evaluated below.

### A. The advisory guideline range

In *United States v. Rita*, 551 U.S. 338 (2007), the Supreme Court restated that the goals of the United States Sentencing Commission in formulating the Sentencing Guidelines are to carry out the objectives of 18 U.S.C. § 3553(a).  In *United States v. Gall*, 552 U.S. 38, 58 (2007), the Supreme Court held that a district court should begin sentencing proceedings by correctly calculating the guidelines. *Id.* at 49.

Probation has calculated the guideline range to be 188-235 months based on an offense level of 34, and a criminal history category of III, (PSR ¶ 138).  Reed objects to the guideline range calculated by the Probation department.

### 1.  Probation properly scored USSG § 2B3.1(b)(2)(E)

Reed objects to the three-level enhancement under USSC §2B3.1 for possession of a dangerous weapon.  Reed does not dispute the fact that the robberies for which he is being held accountable, sledgehammers were possessed during the robberies, and were often used to smash jewelry display cases.  Rather, he claims that because he was not present inside the stores during the robberies, that he does

not know if sledgehammers were used.  Reed's position ignores the facts in the Rule 11 which state that he "instructed members of the conspiracy to use hand-held sledgehammers and hammers to break locked glass display cases . . . or in the alternative to force Jared employees to open the display cases." (ECF No. 432, PageID.3358).  Moreover, at least one coconspirator told the FBI that Reed supplied the hammer to commit a robbery. (Exhibit #4 filed under seal, pg.2).  Finally, at his plea hearing, Reed acknowledged to the Court that even though he did not go inside any of the jewelry stores, he knew that the coconspirators would be carrying sledgehammers and he expected them to use them to smash the display cases. (Plea Hr'g transcript, ECF No. 457, PageID.3799-3801).

It is the government's position that the enhancement is properly scored.  Based on arguments previously presented in several of Reed's codefendants' cases, the Court is well versed and cognizant of the issues relating to the application of this enhancement.  Rather than repeat those arguments here, the government relies on its position enunciated in Antonio Jones's Supplemental Sentencing Memorandum. (ECF No. 403) and asks the Court to apply the enhancement in the present case.

While the Court has previously determined that the conduct of the coconspirators during the course of the robberies may satisfy the "functional approach" established by the Sixth Circuit in *United States v. Milliron*, 984 F.3d 1188, 1196 (6th Cir. 2021), the Court declined to apply it— citing the need to avoid

16

unwarranted sentencing disparities among similarly situated codefendants. Reed's conduct, however, places him apart from the other codefendants in this case.  In addition to being accountable for the use of the sledgehammers during the robberies themselves, Reed possessed a sledgehammer, and actually used it, against another member of the conspiracy.  Reed thought C2 was withholding diamonds taken during the robberies.  To teach him and others not to steal from him, Reed used the sledgehammer to break C2's arm.   Reed's actions were for the purpose of maintaining control over his subordinates in the conspiracy.  His conduct sets him apart from the other codefendants in this case.  Put simply, he is not similarly situated to them, and the enhancement ought to apply.

2.  <u>Probation properly scored 3B1.1(a) – Aggravating Role</u>

Reed objects to probation's determination that he played an organizer/ leadership role in the conspiracy.  The commentary section notes that this adjustment was intended to differentiate between those who organized, led, supervised, managed, or directed others from those who were a mere participant. To qualify for an adjustment the defendant must have been an "organizer, leader, manager, or supervisor of one or more other participants." (Application note 2).

Guideline Section 3B1.1 imposes a sliding scale for enhancements based on a defendant's participation in a crime as a "leader or organizer," or as a "manager or supervisor" of a criminal scheme. The guideline assigns enhancements to the tiers

of leadership as follows:

> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

> c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

In essence Guideline Section 3B1.1 breaks down the enhancement levels based upon the role the defendant played, and the number of participants who were involved, or whether the criminal activity was "otherwise extensive." The greater the role and the size or the extensiveness of the criminal conduct, the greater the increase a defendant will face.

Application note 4 of U.S.S.G. § 3B1.1 directs the Court to consider the following seven factors to determine whether to apply an enhancement under § 3B1.1, and if so, whether the leader/organizer enhancement or the lesser manager/supervisor enhancement is appropriate:

1) the exercise of decision making authority,

2) the nature of participation in the commission of the offense,

3) the recruitment of accomplices,

4) the claimed right to a larger share of the fruits of the crime,

5) the degree of participation in planning or organizing the offense,

6) the nature and scope of the illegal activity, and

7) the degree of control and authority exercised over others.

*See United States v. McDaniel,* 398 F.3d 540, 551-552 (6th Cir 2005); U.S.S.G. § 3B1.1 cmt. 4).

"A district court need not find each factor in order to warrant an enhancement." *United States v. Davis,* 815 Fed.Appx. 908 (6th Cir, 2020) citing *United States v. Castilla-Lugo*, 699 F.3d 454, 460 (6th Cir. 2012); see also *United States v. Gates*, 461 F.3d 703, 709 (6th Cir.2006)(it is not necessary that a defendant meet each of these requirements) and no single factor is dispositive in determining whether §3B1.1 applies. *United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014) ("No single factor is dispositive."); *United States v. Robertson*, 662 F.3d 871, 877 (7th Cir. 2011) ("[N]o single §3B1.1factor is essential in determining whether the adjustment applies, and a court need not assign equal weight to each factor.") The finding of a single factor is sufficient. *United States v. Plunk*, 415 Fed.Appx. 650, 652–53 (6th Cir.2011) ("Under the caselaw of this Circuit, recruiting individuals to complete narcotics deliveries, even on a one time or temporary basis, constitutes supervisory conduct that warrants a § 3B1.1 enhancement."); *United States v. Martinez*, 16 Fed.Appx. 410, 415 (6th Cir.2001) (upholding enhancement where district court found defendant had recruited a drug courier as part of conspiracy). The primary question for a § 3B1.1 enhancement is whether the defendant engaged

in any one of the seven listed factors. See *United States v. Tanner*, 837 F.3d 596, 603 (6th Cir. 2016) (citing *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000)).

To justify the imposition of a leadership or organizer enhancement under U.S.S.G. § 3B1.1(a), the government need only show by a preponderance of the evidence that a defendant "was an organizer or leader of a criminal activity that involved five or more participants." *United States v. Washington*, 715 F.3d 975, 983 (6th Cir.2013). Thus, there are two requirements that the government must satisfy: (1) that there were five or more "participants" in the criminal activity, *or* the criminal activity was "otherwise extensive (emphasis added); and (2) that defendant was the leader or organizer of those participants.

Turning first to the number of participants in the criminal activity, this conspiracy certainly involved more than five members. The Third Superseding Indictment (ECF No. 251) listed ten indicted defendants as members of the conspiracy. As such, Reed had nine other identified participants, other than himself, that he worked and conspired with to commit the various robberies. Additionally, Reed admitted during his plea that he "…conspired with co-defendants, Devon Newby, Tristian Murphy, Kai Rivers, John Davis, Delano Ross, Jamal Ritter, Chance Reed, Antonio Jones, Deshawn Bates, and others.…" (Plea Agreement: ECF No. 432, Page ID.3357, and Plea Hr'g transcript, ECF No. 457, PageID.3798.)  For

the purposes of § 3B1.1, a participant is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S. Sentencing Guidelines Manual § 3B1.1 cmt. n. 1 (2021); see also *United States v. Anthony*, 280 F.3d 694, 698 (6th Cir.2002) (further defining "participants" as persons "who were (i) aware of the criminal objective and (ii) knowingly offered their assistance").  Yet here all ten members of this conspiracy listed in the third Superseding Indictment have been convicted by plea.  The analysis should end here as a review of the record indicates that § 3B1.1(a)'s numerosity requirement was more than satisfied[1].

Turning next to Reed's role, his role in the conspiracy satisfies most, if not all, the factors enunciated by the Sixth Circuit in *McDaniel* that he is a leader or organizer.  Reed admitted in his Rule 11 that he:

- knowingly and intentionally conspired with at least nine others to interfere with commerce by robbery. (ECF No. 432, PageID.3357).

- recruited at least nine other individual "to travel by car to various Jared locations across the United States to rob the stores of diamonds and other jewelry." (ECF No. 432, PageID.3358).

-  instructed members of the conspiracy how to use sledgehammers to smash glass display cases. (*Id.*).

- Instructed members of the conspiracy to take the diamonds and other jewelry from the employees against their will. (*Id.*).

---

[1] Additionally, the Court has previously determined that this conspiracy is "otherwise extensive" in upholding the application of this enhancement for codefendant Newby.

- Instructed other members of the conspiracy to bring the stolen diamonds and jewelry back to Michigan. (ECF No. 432, PageID.3359).

Except for using the sledgehammers to threaten store employees, Reed admitted under oath at his plea hearing that all these facts are true. (Plea Hr'g transcript, ECF No. 457, PageID.3798-3801).

In addition to Reed's admissions contained in the Rule 11, statements made by his conspirators confirm that Reed is a leader or organizer, and that he didn't go on the trips out of town because they were too risky. (Exhibit #7, filed under seal, pg.7).   There are consistent themes in the coconspirators' statements which indicate that Reed would recruit individuals, select the locations for the robberies, and supply and support Reed's crews during their out of state trips to rob the jewelry stores:

- Reed would pick the locations for the robberies. (Exhibit #1, filed under seal, pg. 2).

- Reed wouldn't tell the coconspirators where the exact location was until after they arrived at the target state. (*Id*.).

- Reed supplied money to the coconspirators to finance the trips. (*Id.*).

- Reed acquired the rental cars. (*Id*, pg. 3).

- Reed paid for people to rob jewelry stores for him. (Exhibit #6, filed under seal, pg.1)

- Reed instructed the coconspirators to turn over the stolen merchandise to him, and he would sell it and pay the coconspirators from the proceeds that he received. (*Id.*).

- Reed insisted that he sell the stolen merchandise. (Exhibit #7, filed under seal, pg.2).

- Reed gave coconspirators money to travel to the stores and would pay them after they returned. (*Id.*, pg.3).

- Reed told the coconspirators where to go, and what to look for in the merchandise. (*Id.*).

- Reed was at the top of the conspiracy's hierarchy. (Id., pg.4).

- Specifically for the Erie, Pennsylvania robbery:

  o Reed supplied the location of the store to be robbed. (Exhibit #4, filed under seal, pg.2)

  o Reed told the coconspirators what time he wanted the robbery to occur. (*Id.*).

  o Reed supplied one of the hammers to used in the robbery. (*Id.*).

  o Reed was informed as soon as the robbery was completed, and the coconspirators were fleeing the scene. (*Id.*).

Reed even took a disproportionate share of the proceeds for the robberies. For example, he took nearly $100,000 from the Baton Rouge robbery, and only gave a few thousand dollars to his crew. (Exhibit #2, filed under seal, pg.7)  In fact, Reed's this conduct was so prevalent, that his crew had a name for his behavior: they called it "bird-feeding". (Exhibit #1, filed under seal, pg.2)  C1 claims that Reed's habit of

"bird-feeding" his subordinates is what led one coconspirator to assault the employee of Langhorne, Pennsylvania, causing injury to his face:



***Still image from Langhorne, PA Jared's surveillance video***

C1 states that "Trio", an unindicted coconspirator, was so frustrated with Reed for not paying what he perceived as a fair share of the robbery proceeds, that he took that frustration out on an employee by committing violence.  This demonstrates not only Reed's level of control over the other members of the conspiracy, but it also ties Reed to yet another robbery for which he failed to take responsibility. (*Id.*).

**B. Nature and circumstances of the offense, and the history and characteristics of the offender, 18 U.S.C. § 3553(a)(1)**

1. <u>Nature of the offense</u>

Pursuant to Title 18 United States Code Section 1951(a) - "Hobbs Act Robbery" - it is a violation of federal law to interfere with commerce by robbery or threatened force, violence, or fear of physical injury. The Hobbs Act also punishes conspiracy and attempts to affect interstate or foreign commerce by robbery. Proof of the robbery requires a showing that the defendant unlawfully took or obtained tangible personal property from the victim's person or in his presence without the victim's consent and that the defendant used actual or threatened force, violence, or fear of physical injury to the person or property of the victim or others accompanying the victim. 18 U.S.C. § 1951(b)(1). Conspiracy to Commit Hobbs Act Robbery requires that the perpetrators agree that actual or threatened violence or force will be used to steal property from someone else. By its very nature, a robbery is designed to strike fear in its victims, and then, to take advantage of that fear by stealing from them.

Reed and his coconspirators accomplished just that, time and time again. At his instruction, Reed's underlings stormed into jewelry stores during business hours carrying sledgehammers to intimidate customers and employees of the stores, and to use them to smash glass display cases. During these robberies victims were pushed, dragged, assaulted, and intimidated to facilitate the taking of jewelry. A witness,

from just one of the numerous robberies, told police that she complied with the commands of one of the coconspirators to get on her knees while he was holding a sledgehammer, because she was afraid of being assaulted. Another described the hammer as a cement mallet. Reed's foot soldiers frightened and intimidated others to make money. Worse yet, they did so repeatedly. Reed supervised the commission of numerous robberies during his involvement with this conspiracy. The offense is serious, and his conduct warrants a substantial prison sentence.

2. <u>History and characteristics</u>

Reed is only 32 years old, yet he has already accrued a significant criminal history. His criminal history began in 2008, when he was 17 years old and pled guilty to second degree retail fraud. (PSR ¶ 89). He was sentenced to probation but violated that probationary sentence. (*Id*.).

Next, in January 2010, he was arrested when he provided police with someone else's driver's license after being pulled over for a traffic stop and Reed did not have a license. (PSR ¶ 90).

Then, in May 2010, Reed was arrested, charged, and later convicted for his role in a jewelry store robbery in Pennsylvania. An incident that led to Reed fleeing the scene in a vehicle, smashing into another vehicle, and almost hitting a person with the vehicle, before being stopped. (PSR ¶ 92). He was convicted of aggravated

assault, robbery conspiracy, and fleeing law enforcement, and sentenced to 2-4 years in prison. He was paroled in 2014.

Additionally, despite being thirty-two years old, the defendant has never had a job. (PSR ¶ 135). Looking at his criminal conduct in this case and his 2017 Drug Conspiracy case, it appears his sources of income come from being involved in a conspiracy to distribute drugs or being the leader in a sophisticated conspiracy aimed at stealing diamonds from jewelry stores across the country.

As the Court is aware, Reed committed the instant offense while under the Court's supervision for his 2017 drug conspiracy case.

3. <u>Seriousness of the offense, promoting respect for law,</u>
<u>and providing just punishment, 18 USC § 3553(a)(2)(A)</u>

The advisory guidelines create a range so the courts can sentence similar defendants appropriately based upon the severity of their conduct. Unlike other codefendants who have already been sentenced by the Court, Reed is unique. He did not travel to a select few robbery locations, nor did he only participate in a handful of robberies. Reed alone is responsible for most of the robberies committed. And, as the coconspirators indicated, even if he was not involved in the planning of a robbery, he still got paid.

Reed is far more culpable and complicit in the conspiracy than his codefendants who have been sentenced. This also means that Reed has caused

suffering to more victims and profited more substantially than his sentenced co-defendants.

4. Adequate deterrence and protecting the public from further crimes of the defendant, §3553(a)(2)(B) and (C).

Deterrence may serve to discourage others who are inclined to involve themselves in similar criminal conduct. Deterrence is also an important consideration when fashioning a sentence that will persuade a defendant away from continuing to engage in criminal behavior.

Reed formed and supervised a sophisticated, nationwide conspiracy to rob jewelry stores. To accomplish this, he recruited others to travel all over the Midwest and the Eastern and Southern Seaboards. Each time his underlings left the state to commit another crime, it was his goal to enrich himself by terrorizing others. Reed's criminal conduct was not a momentary lapse of judgment. Rather his actions were calculated, systematic, and repetitive. His criminal conduct did not end, even when this Court gave him an opportunity to be free on bond. Rather, Reed took full advantage of his release to supervise others to commit crimes on his behalf.

5. The need to provide restitution to any victims of the offense, § 3553(a)(7).

The government requests restitution to all victims of Reed's conduct be made part of the sentence imposed by the Court. Signet, the parent company of Jared's Jewelry stores, has documented the total loss for each robbery, which includes lost

merchandise and repairs necessitated by damage caused during the robberies.  The total loss for the Reed's robberies were included in the PSR.

**IV.    <u>Conclusion</u>**

For the reasons outlined above, the government respectfully recommends that the Court impose a sentence at the top of the sentencing guideline.

Respectfully submitted,

DAWN N. ISON
United States Attorney

<u>s/ Robert A. Moran</u>
Robert A. Moran
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9553
robert.moran@usdoj.gov

<u>s/ Ronald W. Waterstreet</u>
Ronald W. Waterstreet
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9593
ronald.waterstreet@usdoj.gov

Dated: December 28, 2022

## Certificate of Service

I hereby certify that on Wednesday, December 28, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

John McManus
Attorney for Defendant, Darell Davie Reed

I further certify that I will serve a copy of the motion and order to seal exhibits, together with the sealed exhibits on John McManus via email.

s/ Robert A. Moran
Robert A. Moran
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9553
robert.moran@usdoj.gov